(C.D. 2601)

D. C. Andrews & Co. of Mass. *v.* United States

United States Customs Court, Second Division

(Decided on rehearing [not published] December 13, 1965)

*William J. Barnhard* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: An importation of paper invoiced as "SEMI-BLEACHED TEST OR CONTAINER BOARD—Caliper .010, Mullen over 60#," was classified by the collector of customs at the port of entry as paper, not specially provided for, other, pursuant to the provisions of paragraph 1409 of the Tariff Act of 1930, as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by Presidential notification, 90 Treas. Dec. 280, T.D. 53877, and, accordingly, was assessed with duty at the rate of 20 per centum ad valorem.

Plaintiff duly protested said assessment alleging that the paper in question was properly dutiable at the rate of 8½ per centum ad valorem, as test or container boards, within the purview of paragraph 1413 of said act, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108. In view, however, of the proviso in paragraph 1402 of the Tariff Act of 1930 to the effect that paper board less than twelve one-thousandths of 1 inch in thickness is to be deemed paper, for tariff purposes, plaintiff has abandoned its claim under said paragraph 1413, as modified, and, by way of an amendment to its protest, now urges that the merchandise in issue is sulphate wrapping paper, not specially provided

for, of the kind made dutiable at the rate of 8½ per centum ad valorem in paragraph 1409 of the Tariff Act of 1930, as modified by said sixth protocol.

Although each of the parties introduced the testimony of two witnesses at the trial of this action, as well as numerous exhibits, the issues in the case have not been briefed, and the court has not, therefore, been provided with the views of adversary counsel with respect thereto. However, it appears from the type of evidence adduced at the trial and from statements of counsel during the course thereof that plaintiff's claim for classification in paragraph 1409, as modified by the sixth protocol, *supra*, rests upon the proposition that the chief use of 100 percent sulphate or kraft paper is for wrapping purposes, and, since the instant paper is 100 percent sulphate paper, it is included within the class of wrapping papers embraced by said provision. Plaintiff's position was explained to the court in the following statement:

Mr. BARNHARD: Sir, this merchandise before the court is known in the trade and I think the evidence has shown and will show that it is known as paper board. It is only because of the Tariff Act provision that paper board under caliper 12 shall be treated for the purposes of the Act as paper. That is the only reason this is regarded as paper at all. This is no commercial designation of this product as paper. We are not contending that. The importer and the domestic companies regard that and buy it and sell it as paper board, but the law says it may be treated as paper. We are saying since this must be treated as paper and since it is a 100 per cent kraft sulphate kraft paper, that the chief use of such paper is for wrapping paper and therefore, if this must be regarded by law as paper, it should be with regard to wrapping paper.

Apparently, it is the contention of the Government, based upon settled law, that, in order for the plaintiff to overcome the presumption of correctness inherent in the collector's classification of the merchandise at bar, it was incumbent upon it to establish that paper of the class or kind of the subject merchandise was chiefly used for wrapping purposes. Seemingly, it is urged that since 100 percent sulphate kraft paper is a term which embraces many different kinds of paper, having many uses in addition to wrappings, it is far too broad a category to be controlling. Rather was it necessary for the plaintiff to show that paper of the particular class of the subject paper and more precisely meeting its specifications was chiefly used for wrapping purposes. As to such paper, it must be the contention of the Government that plaintiff has failed to sustain its burden of proof, in view of the overwhelming evidence that 10 caliper semibleached sulphate paper of the kind here involved is chiefly used for the making of tags and folders, and, to some extent, containers, no one of which application is a wrapping use.

It may be assumed from the foregoing discussion of the apparent positions of the parties, and, as well, from the tariff term relied upon

by plaintiff herein, that the provision for wrapping paper is a designation by use. It is obviously a term which describes a class of paper in accordance with its use. Where use is the determinant in the construction of a tariff provision that which must be considered is chief use. *Bob Stone Cordage Co. et al.* v. *United States*, 51 CCPA 60, C.A.D. 838. In considering chief use, "it is not the use of a particular shipment but rather that of the particular class or type of goods involved which determines its chief use." *United States* v. *The Baltimore & Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719. Whether in the case at bar the "class of paper" comprises all 100 percent sulphate paper, regardless of thickness, texture, and finish, and such paper is chiefly used for wrapping purposes, or is limited to paper with the particular specifications of the merchandise at bar, and the chief use thereof, are the questions to which we must address ourselves in this case, in the light of the evidence of record which, as hereinabove stated, consisted of the testimony of two witnesses for plaintiff, two for the defendant, and various exhibits.

Plaintiff's first witness was John P. McGuirk, vice president of the Jay Madden Corp. of New York City, which company arranged for the instant importation. According to Mr. McGuirk, who had been with the Jay Madden Corp. for 27 years, particularly concerned with sales, his firm is the exclusive sales agent of all of the paper and paperboard mills in Finland and sells the products thereof to customers throughout the United States.

This witness described plaintiff's exhibit 1, a sample representative of the instant merchandise, as a sheet of 100 percent semibleached sulphate pulp, which is otherwise known as kraft paper. It is a type of paper made from wood chips cooked with sodium sulphate, cleaned, washed, and run on the paper machine in a thickness of one one-thousandth of 1 inch. It is sold to the trade as 10-caliper test or container board, and is used in the making of tags. This witness identified 30-odd samples of paper and paperboard, which were moved into evidence on behalf of plaintiff, as plaintiff's collective exhibits 2, 3, 4, 5, 6, and 7, as 100 percent sulphate paper or board, of various thicknesses and weights, some bleached, some semibleached, and some unbleached. He indicated the following diverse uses for these exhibits: As gumming paper; for the making of envelopes; as beaming paper for the wrapping of textile products; as saturating or absorbing paper; as laminating paper; as liner paper and board; for the making of corrugated cartons; as tag board; as milk container board; as wrapping paper; as multiwall sack paper; as bag paper. He further stated that paper, such as was included in plaintiff's collective exhibits 2, 4, 6, and 7, had been classified upon importation as sulphate wrapping paper, and that,

in his opinion, predicated upon general trade information and published production statistics, about 85 percent of all coarse paper would fit into the wrapping paper category. In making this estimation, this witness testified that he would consider bag paper, sack paper, beaming paper, asphalt paper, gumming paper, and waxing stocks to be wrapping paper.

Defendant's witness Thomas G. Curtis is the eastern sales division manager of the printing and converting paper division of the Scott Paper Co., a firm engaged in the manufacture of a wide range of paper and paper products. Mr. Curtis' sales experience in printing and converting spans a period of 18 years, during which time he sold to customers in the eastern and southern sections of the country multiwall bag papers, wrapping papers, printing papers, tag papers, file folder stock, food boards, and a general line of converting grades, both fine and coarse. This witness produced a sample of paper which he identified as 10-point manila tag stock, similar in appearance to plaintiff's exhibit 1. This sample was received in evidence as defendant's exhibit A. According to Mr. Curtis, paper such as defendant's exhibit A is normally converted into many types of tags from shipping tags to work tags, one type of which is illustrated by defendant's exhibit B. It is also occasionally used for posters. He has never sold it as wrapping paper.

This witness also identified a collection of papers and paperboards, which were introduced in evidence in behalf of defendant, as defendant's collective exhibit C. He stated that these exhibits were produced by the Scott Paper Co. from 100 percent sulphate pulp and were useful for conversion into the following articles: Folders, cups, lids, envelopes, meat boards, business office work paper, printing paper, cover paper, bag paper, and butter-pat holders.

On cross-examination, Mr. Curtis testified that he would consider bag paper as a paper used for wrapping purposes, and, since shipping sack paper is a coarse paper, it might be characterized as wrapping paper in the generic sense.

He also agreed that within certain definite limits it is possible to produce a great variety of sulphate products on any one machine in the plant.

On redirect examination, however, this witness stated that he did not consider defendant's exhibit A, which he described as a special industrial converting kraft paper, to be a coarse paper.

Also testifying for the defendant was John D. Johnston, manager of the kraft paper sales division of the Union Bag-Camp Paper Corp., a company which manufactures paper bags, paper boxes, and chemicals. Mr. Johnston has been engaged in the sale of kraft papers

for most of the time since 1923, with, successively, the Bogalusa Paper Co. of Bogalusa, La., the Gaylord Container Corp., and his present employer. He now manages five field sales offices which call on paper converters and some paper dealers throughout the eastern half of the country, primarily to sell kraft converting papers, but he has also had considerable experience with all kinds of wrapping paper. In his opinion, predicated upon his understanding of the general consensus in the paper industry and market, "wrapping paper is generally considered to be an unbleached kraft paper, brown color, and it can vary from the light weight from 30 pound paper up to 120 or 130 pound paper. There are some special uses of wrapping paper that does [*sic*] not require additional strength, and that can be a mixed grade of paper and does not necessarily have to be 100 percent kraft paper." It would embrace papers which are used for wrapping purposes, and it would be sold by basis weight measured against the standard weight of 500 sheets, 24 by 36 inches each, rather than by caliper. He later explained that basis weight 120 would be equivalent to 14- or 15-point caliper, but stated that paper is generally sold by weight rather than thickness.

Mr. Johnston would not consider plaintiff's exhibit 1 as a wrapping paper nor has he ever sold it as such, although he believed that, during periods of paper shortages, as during World War II and the Korean War, it might have been sold, under a distressed sale, as wrapping paper. Both plaintiff's exhibit 1 and defendant's exhibit A are what he would describe as tag stock.

On cross-examination, this witness agreed that 100 percent sulphate bleached paper is used for wrapping purposes, by, especially, bleachers, department stores, and drugstores. He further stated that a caliper of 10 points is in the border line category, "when you get up to a caliper of 10., you are at the very maximum limits of your wrapping paper," and that the trade would be more apt to refer to plaintiff's exhibit 1 and defendant's exhibit A as tag board rather than as paper; more specifically, he would call them file folder stock or tag stock. In the opinion of this witness, some bag paper would be the same paper that is used for wrapping purposes, but not grocer's bag paper, which is usually a very bulky sheet with no finish, whereas a good finish is generally necessary in a wrapping paper.

Mr. Ernest Vaissiere, employed by the Madden Corp. as a technical consultant, was called by plaintiff as a witness in rebuttal. It was the opinion of this witness, predicated upon many years of experience in a technical capacity, visiting hundreds of pulp and paper mills and converting plants throughout the United States and Canada, that the major uses of 100 percent sulphate board under caliper 12

are as follows: "Folding cartons is one. Milk containers is another. Ice cream containers, frozen food containers, cups and other liquid containers are other ones." When asked to state the chief use of 100 percent sulphate board under caliper 12 in the United States market, he replied:

The chief use is for the manufacture of containers. The chief use is for wrapping or packaging products such as ice cream, milk, or anything that needs a wrapper or package.

Mr. Vaissiere was of opinion that the chief use of 100 percent sulphate paper was for wrapping and packaging, which terms he used synonymously for the reason that, in his opinion, "a package is a form of a wrapper," and these terms are generally used interchangeably in the trade.

On cross-examination, this witness stated that plaintiff's exhibit 1 was used for file folders, for tags, and for labels. He has also seen it used for paper cartons and other packages, such as sanitary containers for food products.

Mr. John D. Johnston, recalled as a rebuttal witness for the defendant, testified that the expression 100 percent sulphate was simply a term which reflects the ingredients of a paper, but kraft paper varies in weight, in categories, and in uses, stating:

* * * You have wrapping paper, bag paper and as was pointed out, papers going into milk cartons and papers going into frozen food packaging and papers going into the shipping sacks and grocery bags and shopping bags. There are different types of uses for your 100 percent sulphate paper.

He was further of opinion that wrapping paper was not a "too technical paper"; it is not ordered to real technical specifications for tensile strength and tare qualities for example, as is container board, or carton board; and the latter are not wrapping papers. However, he did admit, on cross-examination, that his company runs all paper to some specific specifications.

The foregoing review of the record, coupled with our consideration of the many exhibits which were received in evidence, convinces us that the position taken by the plaintiff is lacking in merit. Even the inexpert eye is able to perceive from these various samples of 100 percent sulphate kraft paper that there is little uniformity amongst the different qualities, and the testimony tends to support this visual conclusion. Accordingly, it seems obvious that proof of chief use of all 100 percent sulphate kraft papers, if, in fact, it could be shown that such use was for wrapping purposes, would have little if any relationship to the chief use of any one of the different kinds of paper embraced within this category.

We do not find, however, that chief use of all 100 percent sulphate kraft paper has, in fact, been established. On the contrary, the record indicates a myriad of uses of sulphate kraft paper dependent upon weight or thickness, texture, finish, and/or color. And while it appears to have been the purpose of plaintiff to attempt to show that the very substantial use which certain qualities of kraft paper have in the manufacture of bags, cartons, and containers constitutes a use for wrapping purposes, we do not so construe the term "wrapping paper."

Wrapping paper is defined in Webster's New World Dictionary of the American Language, 1964 college edition, as "heavy paper made for wrapping parcels, etc."

The Dictionary of Paper, published under the auspices and direction of the American Paper and Pulp Association, in New York, N.Y., 1951, defines "wrapping paper" as—

A general term applied to a class of papers made of a large variety of furnishes on a Fourdrinier, cylinder, or Yankee machine and used for wrapping purposes. Strength and toughness are predominant qualities.

While in the 1929 Summary of Tariff Information on the Tariff Act of 1922 the term "wrapping paper" is stated to be a phrase descriptive of a wide variety of papers of varying weights made from various substances, it was therein distinguished from stiff boardlike paper used for such purposes as boxes, containers, tags, placards, and the like—a distinction which tends to support the conclusion herein reached that the expression "100 percent sulphate kraft paper" encompasses too broad a category of papers to be employed in the ascertainment of chief use of specific types of kraft paper.

Moreover, all of the witnesses who were asked to comment upon the matter distinguished paper such as is here involved from the kind of coarse paper which the trade might consider to be wrapping paper and agreed that the subject paper was of a class or kind used for the making of tags, labels, and file folders. These are uses which we do not find synonymous with, nor so related to, the process of enclosing and covering a package, as to respond to characterization as wrapping paper uses.

The collector's classification of the subject merchandise in paragraph 1409, as modified, *supra*, as paper, not specially provided for, carries with it the presumption that it is not covered by the provision in said paragraph for wrapping paper, and we are of opinion that the record is insufficient to rebut that presumption.

By reason of the foregoing, we are of opinion that all claims in the instant protest should be overruled.

Judgment will be entered accordingly.